## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| NADIA SLAYTON, | : | CIVIL ACTION |
|  | : |  |
| *Plaintiff*, | : |  |
|  | : |  |
| v. | : | No. 15-0074 |
|  | : |  |
| SNEAKER VILLA, INC., | : |  |
|  | : |  |
| *Defendant*. | : |  |

Goldberg, J.                                                                March 20, 2017

## MEMORANDUM OPINION

This case involves claims of disability discrimination. Plaintiff, Nadia Slayton, alleges that Defendant, Sneaker Villa, Inc., unlawfully terminated her employment in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, *et seq.*, and the Pennsylvania Human Relations Act ("PHRA"), 42 P.S. § 951, *et seq.* Plaintiff claims that Sneaker Villa discriminated against her based on her disability, failed to provide a reasonable accommodation, and retaliated against her for requesting a reasonable accommodation. Presently before me is Sneaker Villa's motion for summary judgment. For the reasons that follow, the motion will be granted only regarding Plaintiff's request for punitive damages on her retaliation and state law claims, but will be denied in all other respects.

### I.        FACTUAL & PROCEDURAL BACKGROUND

The following facts are undisputed, unless otherwise noted.

Plaintiff began working for Defendant as a Corporate Recruiter on November 14, 2012. On February 2, 2013, approximately eighty (80) days into her employment, Plaintiff was seriously injured in a bus accident and hospitalized for five (5) days, suffering compression

fractures of multiple vertebrae in her neck and back, and sustaining a head injury. (Def.'s SOF ¶¶ 23, 27, 29, 30.)

On February 4, 2013, Plaintiff's sister emailed Plaintiff's supervisor, Denise Lee (Director of Human Resources), and apprised her of the accident and Plaintiff's physical condition. Plaintiff was given an application to collect Short Term Disability benefits during her absence from work. During Plaintiff's roughly two-month unpaid absence, Defendant hired a temporary employee to cover the responsibilities of the Corporate Recruiter position. (Def.'s SOF ¶¶ 27, 31–33, 36; Def.'s Ex. K; Denise Lee Dep. 202:2–11.)

On March 28, 2013, Plaintiff emailed Denise Lee requesting the "reasonable accommodation of working full time from home for the next four weeks or until my physical therapy is complete and [my doctor] releases me back to full time status without restrictions." (Def.'s Ex. N.) Plaintiff indicated that her physical restrictions included, *inter alia*, no driving, no lifting anything heavier than five pounds, no bending or walking, and no sitting or standing for long periods of time. (Id.)

On April 1, 2013, Denise Lee responded to Plaintiff's email stating in relevant part:

> As you know Nadia, I have held your position since February 4 and this is a critical time for us as we are constantly opening new stores and creating new positions to support growth. This requires a constant level of support to recruit Store Support and store management candidates, along with the staff for each store and our warehouse. We have job fairs that must be attended, positions that must be posted and monitored, interviews that must take place, and other duties that must be completed. A full time recruiter is required to do this job. Your restrictions will prohibit you from meeting the requirements of this position. Therefore, your request to work from home on a full-time basis will not work for us. I am very sorry that this accident has happened to you. However, I must consider filling this position as I [cannot] hold this job any longer. This is a business decision that I must make. If anything changes with your availability, please let me know. I do wish you the best with your recovery.

(Id.)

Plaintiff replied to Denise Lee's email that same day and asked her to reconsider. Specifically, Plaintiff stated she was:

> … requesting the accommodation to work full time from home only for a **maximum of 4 weeks**. This accommodation could expedite my physical therapy and possibly make my return to the office sooner. Another option would be to work part time in the office approximately 10-15 hours per week and the other 25-30 hours from home which is 40 hours per week until my physical therapy is complete. I can perform all of the essential functions of the duties you listed at home with the exception of the job fairs which I may need a minor accommodation. Posting and monitoring the job descriptions, interviewing, supporting store openings, and other duties assigned require a computer with an internet connection, phone with long distance, and account access with logons all of which I have. Please let me know your thoughts as soon as possible.

(Id.) (emphasis in original).

On April 2, 2013, the next day, Plaintiff went to Defendant's Philadelphia office. The parties dispute what prompted Plaintiff's visit. According to Plaintiff, she called Denise Lee and asked to come in for a meeting to discuss her employment with Defendant, and Lee allegedly agreed to meet. Plaintiff claims she met with Lee in her office, and Lee informed her that her employment was being terminated. Plaintiff further claims that she was asked to turn in her company property. (Pl.'s Dep. 242:6–24; 243:19–23.)

According to Denise Lee, there was no meeting scheduled between the two, and they merely exchanged a brief greeting in passing at the office. (Lee Dep. 148:1–16.) The parties do not dispute that Plaintiff turned in her company key card and employee discount card before she left Defendant's building on April 2. (Def.'s SOF ¶ 52.)

On April 8, 2013, Denise Lee emailed Plaintiff requesting a doctor's note outlining her restrictions so that a "formal decision may be made on [her] continued employment." (Def.'s Ex.

N.) Plaintiff responded that she "thought a formal decision was made regarding [her] employment in [Lee's] office last Tuesday [April 2] that [she] was indeed terminated." (Id.) Nevertheless, Plaintiff agreed to send a copy of her doctor's note. (Id.)

On April 14, 2013, Plaintiff emailed Denise Lee stating that there had been a miscommunication with her doctor's staff, which is why a note had still not been produced. (Def.'s Ex. N.)  On April 15, 2013, Plaintiff emailed a doctor's note to Denise Lee, but less than a half hour later, told Lee to disregard it, and instructed that a new note would be sent momentarily. (Def.'s Ex. O.)

On April 16, 2013, the next day, Denise Lee emailed Plaintiff stating that because she had still not received a "return to work document" from Plaintiff's doctor, Lee had "no choice but to terminate [her] employment effective April 16, 2013." (Id.) Lee also stated there would be new positions in the human resources department opening up in the ensuing months, and Plaintiff should "feel free" to apply. Lee concluded by saying, "I regret this action but I must fill this position immediately." (Id.)

Plaintiff responded just over an hour later stating that she was "baffled" by Lee's email. Plaintiff pointed out that she believed her employment was terminated on April 2, 2013—the day she visited Defendant's office. Plaintiff also stated that she had sent a doctor's note the day before (April 15), and would have another copy faxed to Lee directly from the doctor so that there would be "no mistake about receiving the note." (Def.'s Ex. O.) Later that same day, Plaintiff again emailed Lee asking her to respond to Plaintiff's email, and to "let [Plaintiff] know what accommodations can be made." Plaintiff further requested that Lee let Plaintiff know as soon as possible if her termination stood effective, so that Plaintiff could "know what actions" to take on her end. (Id.)

Lee's reply email indicated that, although she did receive the doctor's note that day, the note stated that Plaintiff was only available to work 20 hours per week in the office (or full-time from home), and Defendant's needs were for a "full-time position in the office." Lee reiterated that Defendant was undergoing "tremendous growth," which required face-to-face interviews, traveling, attendance at job fairs, "and other responsibilities" that Plaintiff could not perform given her physical condition. (Id.; Def.'s Ex. Q.)

Plaintiff again replied and expressed confusion about Lee's message. Plaintiff indicated that her restrictions did not limit her "ability to interview, travel, or attend job fairs." Plaintiff reiterated that she could have worked twenty hours in the office and the other twenty at home, and that her accommodations were only temporary (i.e., her physical restrictions would be "lifted" in another two weeks). Nevertheless, Plaintiff acknowledged that these issues had already been discussed, so the "issue [was] dead." (Id.)

Plaintiff filed her Amended Complaint on January 12, 2015 alleging: disability discrimination; failure to accommodate; and, retaliation. (Am Compl. ¶¶ 41–66.) After a period of discovery, Defendant filed a motion for summary judgment on all of Plaintiff's claims.[1] The motion has been fully briefed, and is now ripe for consideration.

## II.    LEGAL STANDARD

A party moving for summary judgment bears the initial burden of demonstrating that there are no genuine issues of material fact in dispute, and that judgment is appropriate as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once a properly supported motion for summary judgment has been made, the burden shifts to the non-

---

[1] Although Plaintiff included four counts in her Amended Complaint, she appears to advance six distinct claims (three federal claims under the ADA and three state claims under the PHRA).

moving party, who must set forth specific facts showing that there is a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

An issue is "genuine" if a reasonable jury could rule in favor of the non-moving party based on the evidence presented. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). A factual dispute is "material" if it might affect the outcome of the suit under the appropriate governing law. Id. at 423. The non-moving party cannot avert summary judgment with speculation or conclusory allegations, but rather must cite to the record. Ridgewood Bd. of Educ. v. N.E. for M.E., 172 F.3d 238, 252 (3d Cir. 1999); Fed. R. Civ. P. 56(c). On a motion for summary judgment, the court considers the evidence in the light most favorable to the non-moving party. Anderson, 477 U.S. at 256.

### III.   ANALYSIS

#### A.  Disability Discrimination (Disparate Treatment)

A plaintiff may prove disability discrimination by direct evidence as set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 244–46 (1989), or indirectly through the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Walker v. E.I. Dupont De Nemours & Co., 2016 WL 4258927, at *6 (D. Del. Aug. 11, 2016). Here, I conclude that the McDonnell Douglas framework applies.[2]

---

[2] Although Plaintiff argues (in a footnote) that McDonnell Douglas does not apply because she has presented "direct evidence" of discrimination through Defendant's failure to accommodate her disability, I conclude that the McDonnell Douglas framework is appropriate. Plaintiff urges that failure to accommodate *is* direct evidence of discrimination, and cites cases from outside of this circuit to support her position. (Pl.'s Resp. 24, n.3) (citing Meachem v. Memphis Light, Gas & Water Div., 119 F. Supp. 3d 807, 814 (W.D. Tenn. 2015) ("[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination.") (quoting Kleiber v. Honda of Am. Mfg., Inc., 485 F.3d 862, 868 (6th Cir. 2007))). However, in Kleiber, the United States Court of Appeals for the Sixth Circuit expressly qualified the notion that failure to accommodate constitutes direct evidence by instructing that it "is not necessarily true of claims premised upon an adverse employment decision such as … discharge." Kleiber, 485 F.3d at 872 n.2. Here, no party disputes that Plaintiff was discharged.

Additionally, the record does not reflect other "direct evidence" of discrimination warranting departure from McDonnell Douglas. See Cobetto v. Wyeth Pharm., 619 F. Supp. 2d 142, 152–53 (W.D. Pa. 2007) (acknowledging

Under the <u>McDonnel Douglas</u> framework, a plaintiff carries the initial burden of demonstrating a prima facie case of unlawful disability discrimination. If the plaintiff establishes her prima facie case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. Assuming that the employer is able to meet its "relatively light burden," the burden of production shifts back to the plaintiff who must then show, by a preponderance of the evidence, that the employer's proffered reason for the adverse employment action is pretextual. <u>Showers v. Endoscopy Ctr. of Cent. Pennsylvania, LLC</u>, 58 F. Supp. 3d 446, 460 (M.D. Pa. 2014) (citing <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994)). While the burden of production may shift, the burden of persuasion always rests with the plaintiff. <u>Williams v. Philadelphia Hous. Auth. Police Dep't</u>, 380 F.3d 751, 759–60 n.3 (3d Cir. 2004).

## 1. *Plaintiff's Prima Facie Case*

Under the ADA, an employer is prohibited from taking an adverse employment action against a qualified individual on the basis of her disability.[3] 42 U.S.C. § 12112(a). "To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she

---

that <u>McDonnell Douglas</u> does not apply in "direct evidence" cases). "Direct evidence of discrimination is evidence that is so revealing of a discriminatory animus that it is not necessary for the plaintiff to rely on a presumption from … her prima facie case to shift the burden of production to the defendant." <u>Wareham v. Dollar Bank</u>, 937 F. Supp. 2d 656, 682 (W.D. Pa. 2013). <u>see also</u> <u>Tingley-Kelley v. Trustees of Univ. of Pennsylvania</u>, 677 F. Supp. 2d 764, 777 (E.D. Pa. 2010) (concluding the female plaintiff pointed to direct evidence in support of her gender discrimination claim where "stereotypical comments" regarding her "childcare responsibilities" and "status as a mother with young children" were considered by the defendant's admissions committee in denying her application to veterinary school). The Third Circuit has recognized that plaintiffs face a "high hurdle" in attempting to prove discrimination through direct evidence. <u>Anderson v. Wachovia Mortg. Corp.</u>, 621 F.3d 261, 269 (3d Cir. 2010). Here, I conclude that Plaintiff has not pointed to sufficient evidence to supply the requisite "discriminatory animus" warranting a departure from <u>McDonnell Douglas</u>.

[3] The same legal analysis applies to Plaintiff's federal and state claims under the ADA and PHRA, respectively. <u>See</u> <u>Taylor v. Phoenixville Sch. Dist.</u>, 184 F.3d 296, 306 (3d Cir. 1999).

has suffered an adverse employment decision as a result of discrimination. Mercer v. Se. Pennsylvania Transit Auth., 26 F. Supp. 3d 432, 440 (E.D. Pa. 2014) (citing Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)).

Defendant does not dispute that Plaintiff was disabled within the meaning of the ADA, nor does Defendant dispute that Plaintiff was subjected to an adverse employment action (termination). It is the second element—whether Plaintiff was otherwise qualified to perform the essential functions of her job with or without a reasonable accommodation—that Defendant argues Plaintiff cannot demonstrate. Specifically, Defendant urges that "physical presence in the office" and the "ability to travel" are both essential job functions of the Corporate Recruiter position, and thus Plaintiff's indisputable inability to perform these functions rendered her "unqualified" for the position under the ADA. (Def.'s Mot. Summ. J. 4–5.)

Plaintiff first responds that there are factual disputes because the "vast majority of [her] job responsibilities could be accomplished from home and did not require travel," which casts doubt on how "essential" physical presence in the office really was. (Pl.'s Resp. 17–18.) Plaintiff also emphasizes that she "never traveled outside Philadelphia during her employment" with Defendant, which again calls into question how "essential" travel was to the Corporate Recruiter position. (Id. at 18.)

a.   Essential Functions of the Corporate Recruiter Position

"[W]hether a particular function is essential 'is a factual determination that must be made on a case by case basis [upon review of] *all* relevant evidence.'" Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (quoting Deane v. Pocono Medical Ctr., 142 F.3d 138, 148 (3d Cir.1998) (en banc)) (emphasis in original). The United States Court of Appeals for the Third Circuit has repeatedly cautioned against usurping the role of the jury in the

context of deciphering whether a given function is "essential." See e.g., Skerski v. Time Warner Cable Co., a Div. of Time Warner Entm't Co., L.P., 257 F.3d 273, 279–283 (3d Cir. 2001); Deane, 142 F.3d at 148.

Whether a job duty is an "essential function" turns on whether it is "fundamental" to the position. "Marginal functions" of the position are insufficient. Turner, 440 F.3d at 612 (citing 29 C.F.R. § 1630.2(n)(1)); 29 C.F.R. § Pt. 1630, App. 1630.2(n) ("The purpose of this [inquiry] is to ensure that individuals with disabilities who can perform the essential functions of the position … are not denied employment opportunities because they are not able to perform marginal functions of the position.").

Section 42 U.S.C. § 12111(8) of the ADA states that, in assessing whether a given job function is essential, "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).

Additionally, the Equal Employment Opportunity Commission's ("EEOC") "Interpretive Guidance" defining "essential functions" states that a function may be deemed "essential" because: (i) the reason the position exists is to perform that function; (ii) the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function may be highly specialized so that the incumbent in the position is hired for her expertise or ability to perform the particular function. 29 C.F.R. § 1630.2(n)(2).

The EEOC regulations further set forth a non-exhaustive list of evidentiary examples that may assist courts with identifying the "essential functions" of a job: (i) the employer's judgment as to which functions are essential (which reiterates the dictates of § 12111(8)); (ii) written job

descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement; (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs. 29 C.F.R. § 1630.2(n)(3); see also Skerski, 257 F.3d at 279 (discussing and applying the seven factors). "[N]one of the factors nor any of the evidentiary examples alone are necessarily dispositive." Id. at 279.

### i.  *Physical Presence in the Office*

Defendant presses that summary judgment is appropriate because it is undisputed that Plaintiff's physical presence at the workplace is an essential function. Defendant notes that it is undisputed that during Plaintiff's relatively short tenure, she participated in "[a]t least 20" in-person interviews in which she was directly involved in asking questions of interviewees.[4]  (Pl.'s Dep. 106:3–122; Def.'s SOF ¶¶ 27–28.) Plaintiff cites to cases from outside of this circuit in support of the proposition that physical presence is not necessarily an essential job function, and that she could have performed most of her job duties from home. She further emphasizes that she never took "the lead" in the interviews in which she was physically present. (Pl.'s Resp. 17–18.)

With respect to the dictates of 42 U.S.C. § 12111(8), as noted above, consideration must be given to Defendant's judgment that physical presence in the office was an essential function. Section 12111(8) further mandates that a written job description "shall be considered evidence" of a job's essential functions. Here, the written description for the Corporate Recruiter position does not speak directly to physical presence in the office either as one of the job's seventeen (17)

---

[4] Defendant did not specifically argue that face-to-face interviews are an essential function of the Corporate Recruiter position. In any event, as will be discussed *infra*, one of Plaintiff's proposed accommodations was to work *in the office* 10-15 hours per week. Viewed in the light most favorable to Plaintiff, a reasonable fact finder could conclude that Plaintiff's proposed work schedule would allow her to perform face-to-face interviews while physically present in the office.

"Principle [sic] Duties and Responsibilities" or as one of the "Qualifications/Skills & Knowledge Requirements." (Def.'s Ex. C.)

Additionally, application of the EEOC definitions does not necessarily align neatly with the function of being "physically present" at one's job. It is not entirely clear how one's physical presence in the office can be distributed to other employees, nor does it appear to be uncontested in this case that physical presence in the office is "highly specialized" such that Plaintiff was hired for her expertise in the ability to be physically present in the office. See 29 C.F.R. § 1630.2(n)(2).[5]

As noted above, Plaintiff maintains that she could have performed the true essential functions of her job at home, so long as she had access to a telephone and the Internet. Her testimony in that regard revealed the following:

> Q: [W]ould you, for the most part, just come into the office, sit in your office and do job postings and phone screenings all day?
>
> A: Yes, … that was our major task.
>
> Q: That was your major task. You never went to any job fairs even though you requested it, right?
>
> A: Correct.
>
> Q: Did you ever travel to any store openings?
>
> A: No.
>
> Q: Did any stores open while you were at Sneaker Villa?
>
> A: Yes.

---

[5] Regarding the seven EEOC evidentiary examples, I again note that Defendant's judgment that physical presence was essential must be given consideration. However, at this stage, the omission of "physical presence in the office" from the written job description weighs in Plaintiff's favor. 29 C.F.R. § 1630.2(n)(3). As to the remaining examples, evidence of a collective bargaining agreement (factor v) is not of record. The "consequences of not requiring [Plaintiff] to perform the function" (factor iv) lies at the heart of this lawsuit (i.e., the parties dispute what the consequences would have been if Plaintiff had worked from home). See Skerski, L.P., 257 F.3d at 280 ("[C]onsideration of the seven evidentiary examples included in § 1630.2(n)(3) suggests caution against any premature determination on essential functions [when] at least some of them lean in [a plaintiff's] favor.").

(Pl.'s Dep. 125:8–23.)

In light of § 12111(8), the EEOC interpretive guidance and evidentiary examples, and because I must view the evidence in the light most favorable to Plaintiff, I conclude that a genuine dispute of material fact exists as to whether physical presence in the office was an essential job function. See e.g., Pagonakis v. Express LLC, 315 F. App'x 425, 430 (3d Cir. 2009) (reversing summary judgment in the employer's favor because, *inter alia*, there were "issues of disputed fact … as to whether [the plaintiff] working in the store 40 hours a week (as opposed to working from home some hours) is an essential function[.]"); Bisker v. GGS Info. Servs., Inc., 2010 WL 2265979, at *4 (M.D. Pa. June 2, 2010) ("[B]ased on the record, there is a factual dispute on whether attendance [at work] … and face-to-face interaction with fellow employees was an essential function of [the plaintiff's] job."); Turner, 440 F.3d at 613 ("[W]e have historically refused to make such a factual finding on our own, lest we run afoul of our own directive to the district courts that these issues are for the jury to decide.").

### ii. *Ability to Travel*

Defendant also argues that Plaintiff's inability to travel rendered her "unqualified" for the Corporate Recruiter position, as this too constituted an essential job function. Defendant highlights that Plaintiff admitted during her deposition that she was advised during her interview process that the company was expanding, and that the position required travel both inside and outside the Philadelphia area for job fairs and recruitment initiatives. (Pl.'s Dep. 75:8–19; 77:20–23; 94:8–21; 99:5–19; Def.'s SOF 19–20.)

Once again, § 12111(8) dictates that Defendant's judgment that the ability to travel was an essential function must be considered. Although the written job description of the Corporate Recruiter position does not list the ability to travel as one of the "Principle [sic] Duties and

Responsibilities," the "[a]bility to travel in all markets serviced by [Defendant]" is listed under the "Qualification/Skills & Knowledge Requirements" section of the position summary. (Def.'s Ex. C, p. 3.)

Importantly, courts have recognized that a "requirement" of a given position may be distinguished from the "essential function(s)" of that position for purposes of assessing the second element of a plaintiff's prima facie case. "[T]he essential function requirement focuses on the desired result rather than the means of accomplishing it." Skerski, 257 F.3d at 280 (citing 136 Cong. Rec. 11,451 (1990)).[6] See also Acevedo v. City of Philadelphia, 680 F. Supp. 2d 716, 733 (E.D. Pa. 2010) ("While an employer is free to craft requirements for the positions that it creates, it is not free to avoid the strictures of the ADA … by simply characterizing all 'requirements' as 'essential functions.' A distinction must be made between the requirements of a given position and the essential functions of that position.") (citations omitted); Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 329 (3d Cir. 2003) ("Describing [punctuality] as a requirement is not necessarily the same as denominating [punctuality] as an essential function."). Here, a fact finder could reasonably conclude that the language of Defendant's written job description indicates that the ability to travel is a *requirement* of the position.

Moreover, in evaluating the interpretive guidance from the EEOC, it is not undisputed that the Corporate Recruiter position exists to perform "travel," or that Plaintiff was hired because of her expertise in traveling. 29 C.F.R. § 1630.2(n)(2). Plaintiff persuasively argues that despite her requests to do so, she never actually traveled to any job fairs during her time working for Defendant. (Pl.'s Dep. 110:13-22; 111:22–24; 4–23.) See Grosso v. UPMC, 857 F. Supp. 2d

_____

[6] For example, "in a job requiring the use of a computer, the essential function is the ability to access, input, and retrieve information from the computer. It is not essential that the person be able to use the keyboard or visually read the computer screen, if the provision of adaptive equipment or software would enable the person with the disability … to control the computer and access the information." Skerski, 257 F.3d at 281.

517, 534 (W.D. Pa. 2012) ("An employee's actual experience is also something to consider" in assessing whether a job function is essential) (citing Sherski, 257 F.3d at 281); Conneen, 334 F.3d at 326 ("[An] employee's actual experience is also relevant to the inquiry.").[7]

Because at least some of the factors that I must consider weigh in Plaintiff's favor, and because I must view the evidence and all reasonable inferences in the light most favorable to Plaintiff, I conclude that it would be premature to decide at this stage whether the ability to travel was an essential job function of the Corporate Recruiter position. See Turner, 440 F.3d at 612–13; Deane, 142 F.3d at 148; Skerski, 257 F.3d at 280.

b.   Performance with or without an Accommodation

As noted above, the ultimate inquiry guiding my analysis with respect to the second element of Plaintiff's prima facie case is not simply whether Plaintiff could perform the essential functions of her job—it is whether she could perform the essential functions *with or without* a reasonable accommodation. See Turner, 440 F.3d at 611–12 ("The question we are confronted with … is not whether [the plaintiff] can perform the essential functions of her job without reasonable accommodation, for clearly she cannot; but, rather, whether she can perform the essential functions of her job *with* reasonable accommodation."). "An employer may be required to restructure a job by reallocating or redistributing nonessential, marginal job functions; however, the employer is not required to reallocate essential functions." Supinski v. United Parcel Serv., Inc., 413 F. App'x 536, 542 (3d Cir. 2011) (citations and quotations omitted). "As with the issue of 'essential function,' the issue of 'reasonable accommodation' presents a fact question." Turner, 440 F.3d at 614–15.

---

[7] In fact, Plaintiff expressly told Denise Lee during one of their final email exchanges that her physical restrictions did not impede her "ability to interview, *travel*, or attend job fairs." (Def.'s Ex. O) (emphasis added). Thus, even if the ability to travel is an essential function, it appears that a factual dispute remains as to whether Plaintiff could actually perform this function.

Because factual questions remain as to whether physical presence in the office and the ability to travel were essential functions of the Corporate Recruiter position, I am similarly precluded from deciding, as a matter of law, that Plaintiff was incapable of performing the essential functions of her job with or without a reasonable accommodation. See e.g., Acevedo v. City of Philadelphia, 680 F. Supp. 2d 716, 738 (E.D. Pa. 2010) (recognizing that where a genuine issue of material fact persists regarding the essential function(s) of a position, courts are prevented from addressing the issue of whether a plaintiff could perform those function(s) with or without a reasonable accommodation).

### 2. *Defendant's Legitimate, Non-Discriminatory Reason for Termination*

Having found factual disputes regarding the essential functions of the Corporate Recruiter position (and thus whether Plaintiff is a "qualified individual"), the burden of production now shifts to Defendant to articulate a facially legitimate, nondiscriminatory reason for Plaintiff's termination. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). The burden on Defendant at this stage is "relatively light," and is satisfied if the employer introduces "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Id. at 763. "At this stage, the defendant need not prove that the articulated reason actually motivated its conduct." Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) (citations and quotations omitted).

Defendant argues that it terminated Plaintiff "based on her inability to travel, conduct interviews in distant markets, or physically work in the Philadelphia office to conduct face to face interviews." (Def.'s Mot. Summ. J. 10.) Plaintiff does not dispute that she participated in "at least 20" face-to-face interviews during her relatively short tenure with Defendant, nor does she dispute that the company was growing during the relevant time period. (Pl.'s Dep. 77:20–23;

106:3–122; Def.'s SOF ¶ 18; Def.'s Ex. H.) Plaintiff also testified that she was advised during her interview that the position required "some travel" to assist with hiring efforts. (Pl.'s Dep. 75:8–24; 76:1–22.)

In light of this evidence, I conclude that Defendant has met its relatively light burden of articulating facts that, if accepted, could constitute facially legitimate, nondiscriminatory reasons for Plaintiff's termination.

### 3. *Pretext*

The burden of production now shifts back to Plaintiff to establish, by a preponderance of the evidence, that Defendant's proffered legitimate, non-discriminatory reason was pretextual. Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 644–45 (3d Cir. 2015). To establish pretext, a plaintiff "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Burton, 707 F.3d at 426–27 (citing Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)).

Regarding the first method of demonstrating pretext, if a plaintiff's evidence pertains to the credibility of the employer's proffered justification, the evidence "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Fuentes, 32 F.3d at 765 (internal citations omitted).[8]

---

[8] "[I]f a plaintiff has come forward with sufficient evidence to allow a finder of fact to discredit the employer's proffered justification, she need not present additional evidence of discrimination beyond her prima facie case to survive summary judgment." Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013). "This is because the factfinder may infer from the combination of the prima facie case, and its own rejection of the employer's proffered reason, that the employer engaged in the adverse employment action for an invidious reason." Id. at 427.

In an effort to discredit Defendant's proffered reasons for her termination, Plaintiff argues that Denise Lee first fired her on April 2 before ever requesting a doctor's note on April 8, and offered Plaintiff's job to someone else prior to the "second time" that Lee allegedly fired Plaintiff on April 16. (Pl.'s Resp. 24.)

As discussed *supra*, a factual dispute remains as to when exactly Plaintiff's termination became effective (April 2 or April 16). Denise Lee's testimony does not exactly clarify this issue, and, viewed in the light most favorable to Plaintiff, Lee's testimony reflects that she may have taken steps to offer Plaintiff's job to someone else *prior* to Plaintiff's termination becoming "effective" on April 16, 2013 for the "second" time (i.e., before she received a doctor's note from Plaintiff). (Lee Dep. 200:20–23; 201:1–14; 163:2–9; 164:14–23; 174:16–22.)

If a fact finder ultimately believes that Lee offered Plaintiff's job to someone else prior to receiving an updated doctor's note outlining Plaintiff's physical restrictions, that fact finder could rationally and reasonably conclude that Defendant took steps to terminate Plaintiff before it fully ascertained the limitations imposed by her disability. As such, a fact finder could infer that Plaintiff's perceived inability to travel and/or be physically present in the office are "unworthy of credence" because Defendant had *already* decided to terminate Plaintiff before meaningfully assessing her inability to perform those functions.

Moreover, record evidence reflects that Denise Lee's email statements leading up to the alleged April 2 meeting largely pertained to Plaintiff's purported inability to work "full time." However, Lee subsequently requested a doctor's note on April 8 so that a "formal decision [could] be made" regarding Plaintiff's employment, and went on to cite Plaintiff's failure to produce a "return to work" document as giving Lee "no choice" but to terminate Plaintiff effective April 16. Viewed in the light most favorable to Plaintiff, a reasonable fact finder could

further view Lee's respective statements regarding Plaintiff's termination (inability to work "full time" versus failure to produce a doctor's note) as inconsistent, and thus consider them "unworthy of credence."

At this stage, Plaintiff has pointed to facts that could demonstrate pretext, and thus I will deny Defendant's motion for summary judgment as to Plaintiff's disparate treatment claim.

## B. Plaintiff's "Failure to Accommodate" Claim

The adverse employment decisions barred by the ADA include "not only adverse actions motivated by prejudice and fear of disabilities, but also . . . failing to make reasonable accommodations for a plaintiff's disabilities." Mercer v. Se. Penn. Transit Auth., 26 F. Supp. 3d 432, 440 (E.D. Pa. 2014) (quoting Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999)). As such, "[a]n employer's failure to reasonably accommodate the disabilities of an otherwise qualified employee constitutes an adverse employment action under the third element of the prima facie case of generic disability discrimination." Sharbaugh v. W. Haven Manor, LP, 2016 WL 6834613, at *8 (W.D. Pa. Nov. 21, 2016); Mercer, 26 F. Supp. 3d at 440.[9]

Specifically, "the ADA defines discrimination to include 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business.'" Mercer, 26 F. Supp. 3d at 440 (quoting 42 U.S.C. § 12112(b)(5)(A)). The ADA further states that discrimination includes "denying employment opportunities to [an] … employee who is an

---

[9] As discussed *supra*, Defendant does not dispute that Plaintiff was disabled within the meaning of the ADA or that she suffered the adverse employment decision of termination. Additionally, factual disputes remain with respect to whether or not Plaintiff was an otherwise "qualified individual." For purposes of Plaintiff's failure to accommodate claim, my discussion above applies with equal force on the issue of whether or not Plaintiff is an otherwise qualified individual. I will focus my analysis on whether there is sufficient record evidence from which a reasonable fact finder could conclude that Defendant breached its duty to provide a reasonable accommodation (a separately recognized adverse employment decision under the ADA).

otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee[.]" 42 U.S.C. § 12112(b)(5)(B).

Notably, failure to accommodate claims "do not require that an employer's action be motivated by a discriminatory animus directed at the disability and, therefore, the <u>McDonnell Douglas</u> test does not apply." <u>Sharbaugh</u>, 2016 WL 6834613, at *7.

To establish that an employer breached its duty to provide a reasonable accommodation, a plaintiff must demonstrate: (1) that she was disabled and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated. <u>Armstrong v. Burdette Tomlin Mem'l Hosp.</u>, 438 F.3d 240, 246 (3d Cir. 2006); <u>Taylor</u>, 184 F.3d at 319–20. Courts frequently rely on this four-part test to determine whether an employer failed to participate in what has been referred to as the "interactive process."

Here, Defendant does not dispute that Plaintiff can satisfy the first two prongs (i.e., that it knew of Plaintiff's disability, and that she requested an accommodation). However, Defendant argues that, as a matter of law, it made a good faith effort to assist Plaintiff, and, in any event, she could not have been reasonably accommodated. (Def.s' Mot. Summ. J. 12.)

## 1.   *Did Defendant Engage in Good Faith?*

Defendant argues that it demonstrated good faith by permitting Plaintiff to take a roughly two-month leave of absence with "no questions asked." Defendant points out that it further requested a doctor's note from Plaintiff (multiple times) which turned out to be inconsistent with Plaintiff's stated limitations. (<u>Id.</u> at 12.)

Plaintiff responds that Denise Lee failed to meaningfully respond to both Plaintiff's March 28, 2013 email requesting an accommodation and Plaintiff's April 1, 2013 email proposing a work schedule that included part-time work in the office and part-time work from home (which, collectively, would have totaled a full-time schedule). Plaintiff insists that Defendant did not consider possible accommodations that might allow Plaintiff to keep her job. (Pl.'s Resp. 11.)

"Once an accommodation is requested, the employer is required to engage in the interactive process during which the employer and employee identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome them." Bielich v. Johnson & Johnson, Inc., 6 F. Supp. 3d 589, 617 (W.D. Pa. 2014); Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246 (3d Cir. 2006) ("[I]f an employer has adequate notice of an employee's disability, and the employee requests accommodations for the disability, it becomes the responsibility of the employer to engage the employee in the interactive process of finding accommodations[.]" ); see also 29 C.F.R. § 1630.2(o)(3) ("To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the individual with a disability[.]").

Courts have summarized the interactive process (and in particular, good faith) as follows:

> The interactive process is aimed at determining what reasonable accommodations, if any, can address the employee's disability. The interactive process requires a great deal of communication between the employee and the employer, as both parties "bear responsibility for determining what accommodation is necessary. Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome. A failure to

> communicate, either by way of initiation or response, may be an
> act of bad faith.

Sharbaugh, 2016 WL 6834613, at *9 (internal quotations and citations omitted); see also

Williams, 380 F.3d at 776.[10]

As noted above, factual disputes remain with respect to the date on which Plaintiff was

actually terminated. While providing Plaintiff with a two-month leave of absence "no questions

asked" could certainly be viewed as an accommodation, when viewed in the light most favorable

to Plaintiff, a reasonable fact finder could also conclude that Denise Lee did not necessarily

engage in the interactive process with Plaintiff during the pair's March 28 and April 1, 2013

email exchange (which arguably constituted separate and distinct requests for accommodation).

On this point, Lee's testimony revealed the following:

> Q: Had you decided on Saturday, March 30th, that most likely you were going to
>     fire [Plaintiff]?
>
> A: I don't know.
>
> Q: Is that possible?
>
> A: Yes.
>
> …
>
> Q: Okay. So as the Director of HR, you have an employee who has turned in [her]
>     keycard, turned in her employee discount [card], cleaned out [her] office, and sent you
>     an email saying, I thought you fired me when I was in your office last week, and you
>     didn't feel any need to clear up any of that misunderstanding with [Plaintiff]?
>
> A: No.

---

[10] To the extent Defendant argues that Plaintiff failed to produce a doctor's note in a timely fashion, I conclude that this issue is not dispositive. A factual dispute remains as to when Plaintiff was terminated. If Lee terminated Plaintiff on April 2 before ever requesting a doctor's note on April 8, the issue is moot. I further conclude that, based on the particular circumstances of this case, and when viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that a one week turnaround time to produce a doctor's note does not demonstrate that Plaintiff was responsible for the breakdown in the interactive process—particularly where she informed Denise Lee that she was having difficulty coordinating with the doctor's office staff.

(Lee Dep. 129:15–19; 145:10–14; 174:16–22.) Lee further acknowledged that she sent an internal email on March 30, 2013 requesting that Plaintiff's access to Defendant's systems be discontinued. (Id. at 127:17–22.)

In light of this testimony, in addition to the fact that Plaintiff modified her request for a temporary accommodation to include working part-time in the office (once Lee denied her initial request to work from home), I conclude that a factual dispute remains as to whether Defendant engaged in good faith. See Bernhard v. Brown & Brown of Lehigh Valley, Inc., 720 F. Supp. 2d 694, 701 (E.D. Pa. 2010) ("Where … an employee makes a request for an accommodation, the employer cannot merely dismiss that request out of hand as unreasonable. Indeed, that is precisely the type of employment practice the ADA seeks to avoid by requiring employees and employers to engage in the interactive process.").[11]

### 2.  *Could Plaintiff have been Reasonably Accommodated?*

Next, Defendant argues that *even if* it failed to demonstrate good faith, Plaintiff still cannot demonstrate that she could have been reasonably accommodated.

"Even if [an] employee requests an accommodation and the employer refuses to engage in the interactive process, a *prima facie* case is not made out unless the employee also submits evidence establishing that she could have been reasonably accommodated." Bielich, 6 F. Supp. 3d at 617. On the other hand, "[i]f an employee could have been reasonably accommodated but for the employer's lack of good faith, the employee will win on [her] failure to accommodate claim." Armstrong, 438 F.3d at 246. "Summary judgment can be granted in favor of the employer where the employee's proposed accommodations would be clearly ineffective." Bielich, 6 F. Supp. 3d at 617–18.

---

[11]  Additionally, as noted *supra*, unresolved factual questions remain as to whether Lee began the process of recruiting someone to fill Plaintiff's position before Lee received a doctor's note from Plaintiff. (Lee Dep. 156:15–19; 200:20–23.)

"As with the issue of 'essential function,' the issue of 'reasonable accommodation' presents a fact question." Turner, 440 F.3d at 614. In determining whether a genuine dispute of a material fact exists regarding the reasonableness of an accommodation, courts must first examine whether a plaintiff has made a "facial showing" that the proposed accommodation is reasonable. If a plaintiff meets that burden, the burden then shifts to the defendant to prove, as an affirmative defense, that the requested accommodation is unreasonable, or would impose an "undue hardship" on the employer. Id. at 614.

Here, I conclude that Plaintiff has demonstrated that a factual question exists as to whether her requested accommodations were facially reasonable. Plaintiff did not request an extension of her leave of absence (i.e., she did not request additional "time off" from work). She requested to work from home for a "maximum of four weeks." Plaintiff alternatively proposed a schedule that would require her to work in the office 10-15 hours per week, and the remaining 25-30 hours from home. A fact finder could conclude that these are practical solutions, particularly given their temporary nature. I further observe that the term "Reasonable Accommodation" is expressly defined to include "part-time or modified work schedules." 29 C.F.R. § 1630.2(o)(2)(ii).

The burden now shifts to Defendant to demonstrate that Plaintiff's request was unreasonable (i.e., that it would have imposed an undue hardship). Under the ADA, the term "undue hardship" means an accommodation "requiring significant difficulty or expense," when considered in light of several factors.[12] 42 U.S.C. § 12111(10); 29 C.F.R. § 1630(p).

---

[12] These factors include: (i) the nature and cost of the accommodation (ii) the overall financial resources of the facility involved providing the reasonable accommodation; the number of employees at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) the overall financial resources of the employer; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and (iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the

Additionally, "an employer is not required to provide a reasonable accommodation if it would … conflict with seniority rules." Turner, 440 F.3d at 614.

Defendant argues that Plaintiff's proposed accommodations, even if facially reasonable, would have imposed an undue burden because, during Plaintiff's absence, her responsibilities "fell mainly on [Denise] Lee." (Def.'s Mot. Summ. J. 8.) However, when asked about which of Plaintiff's job functions were covered by her temporary replacement, Lee testified, "For the most part, *all of them*." (Lee Dep. 85:22–24) (emphasis added).

Viewing this evidence in the light most favorable to Plaintiff, I cannot conclude—as a matter of law—that the accommodation proposed by Plaintiff would have placed an "undue hardship" on Defendant because it would have conflicted with seniority rules. I will therefore deny Defendant's motion as it relates to Plaintiff's failure to accommodate claim.

### C.  Plaintiff's Retaliation Claim

Defendant states—in passing—that summary judgment is appropriate on Plaintiff's retaliation claim. (Def.'s Mot. Summ. J. 4.)  While Defendant generally points out that this claim is also subject to the McDonnell Douglas burden-shifting framework, Defendant fails to cite any legal authority in support of what must be established to make out a prima facie case of retaliation, fails to identify which elements of Plaintiff's retaliation claim she cannot establish, and fails to identify or otherwise explain why there is an absence of a materially disputed fact with respect to this claim. Defendant's entire brief in support of its motion for summary judgment focuses on Plaintiff's discrimination claims. Accordingly, I conclude that Defendant has not met its burden of submitting a properly-supported summary judgment motion as it relates to Plaintiff's retaliation claim. The motion will therefore be denied.

---

geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.  § 12111(10)(i)-(iv). Neither party discussed in any detail how these factors relate to the facts of this case.

### D. **Plaintiff's Request for Punitive Damages**

Defendant argues that even if Plaintiff's claims are allowed to proceed, there is no basis (as a matter of law) for assessing punitive damages against Defendant. (Def.'s Mot. Summ. J. 15.) Defendant further points out that punitive damages are not available under the PHRA. Plaintiff responds that Denise Lee was responsible for ensuring that Defendant complied with relevant employment laws, and claims she failed to engage in the interactive process. According to Plaintiff, this demonstrates that Defendant could have acted with the requisite "reckless indifference" to Plaintiff's rights under the ADA to warrant punitive damages. (Pl.'s Resp. 25.)

Both parties cite to the Third Circuit's decision in Gagliardo v. Connaught Labs., Inc., 311 F.3d 565 (3d Cir. 2002). In Gagliardo, the Third Circuit observed that punitive damages are not available under the PHRA. Id. at 570 n.3. See also Montanez v. Missouri Basin Well Servs., 2015 WL 1608804, at *8 (M.D. Pa. Apr. 10, 2015) ("[The plaintiff] does not state a claim for punitive damages under the PHRA, nor are such damages allowable under current state law."). Accordingly, I will grant Defendant's motion insofar as it seeks dismissal of Plaintiff's request for punitive damages under the PHRA.

Other courts within this circuit have similarly concluded that punitive damages are unavailable for ADA retaliation claims. See e.g., Baker v. PPL Corp., 2010 WL 419417, at *8 (M.D. Pa. Jan. 29, 2010); McFadden v. Biomedical Sys. Corp., 2014 WL 80717, at *6 (E.D. Pa. Jan. 9, 2014). As such, I will also grant Defendant's motion insofar as it seeks dismissal of Plaintiff's request for punitive damages in connection with her ADA retaliation claim.

The parties do not dispute that punitive damages are statutorily available for Plaintiff's two federal disability claims under the ADA (disparate treatment and failure to accommodate). Indeed, "[p]unitive damages are available under the ADA when the 'complaining party

demonstrates that the [employer] engaged in a discriminatory practice … with malice or with reckless indifference.'" Gagliardo, 311 F.3d at 573 (quoting 42 U.S.C. § 1981a(b)(1)). "These terms focus on the employer's state of mind and require that an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." Id. at 573; see also Alexander v. Riga, 208 F.3d 419, 431 (3d Cir. 2000) ("'Malice' and 'reckless indifference,' in this context … refer not to the egregiousness of the [defendant's] conduct, but rather to the [defendant's] knowledge that it may be [violating] federal law.'").

Denise Lee testified that she was responsible for ensuring that employees at Sneaker Villa complied with the ADA. (Lee Dep. 38:20–22; 40:1–21.) In light of her testimony, and the many outstanding factual disputes—in particular, whether or not Lee adequately participated in the interactive process—I conclude that it would be premature to decide, as a matter of law, the issue of punitive damages. Accordingly, Defendant's motion will be denied as it relates to Plaintiff's request for punitive damages in connection with her two ADA discrimination claims.

## IV.   <u>CONCLUSION</u>

Defendant's motion for summary judgment will be granted in part and denied in part. The motion will be granted only insofar as it seeks dismissal of Plaintiff's request for punitive damages in connection with her federal retaliation claim and state law claims under the PHRA. The motion will be denied in all other respects.

An appropriate Order follows.